## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **KENNETH L. PATTERSON,**[1] ) | |
| ) | |
| **Plaintiff,** ) | **CIVIL ACTION** |
| ) | |
| **v.** ) | **No. 14-1312-JWL** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Acting Commissioner of Social Security

(hereinafter Commissioner) denying Disability Insurance benefits (DIB) and

Supplemental Security Income (SSI) benefits under sections 216(i), 223, 1602, and

1614(a)(3)(A) of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and

1382c(a)(3)(A) (hereinafter the Act).  Finding no error, the court ORDERS that judgment

shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the

Commissioner's decision.

## I.   Background

_____

[1]Plaintiff's Social Security Brief is captioned "Kenneth I. Patterson" (Doc. 16) (hereinafter Pl. Brief), but the case is captioned "Kenneth L. Patterson" (Docket Sheet, Doc. 1 (Complaint)), and Plaintiff's middle name is shown as "Lee" in the decision under review here.  (R. 15-28).  The court finds that the "I" in the caption to Plaintiff's Brief is a typographical error on the part of Plaintiff's counsel.

Plaintiff applied for DIB and SSI benefits, alleging disability beginning November 11, 2010.  (R. 15, 189, 195).  He exhausted proceedings before the Commissioner, and now seeks judicial review of the final decision denying benefits.  Plaintiff claims that the Administrative Law Judge (ALJ) erred in his step three evaluation of Listing 1.04, and in a multitude of respects in his residual functional capacity (RFC) assessment, and that the Appeals Council failed properly to consider additional evidence presented to it in the first instance after the ALJ issued his decision.  Plaintiff asks the court to "reverse for payment of benefits and, alternatively, for further proceedings to correct the many errors committed."  (Pl. Brief 25).

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  The Act provides that on judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The court determines whether the ALJ applied the correct legal standard and whether his factual findings are supported by substantial record evidence. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting

Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining at step four whether, in light of the RFC assessed, claimant can perform his past relevant work; and at step five whether, when also considering the vocational factors

3

of age, education, and work experience, claimant is able to perform other work in the economy. Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work. Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC assessed. Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

The court finds no error. It begins its analysis with two preliminary matters to set the stage, and then considers the other issues presented by Plaintiff.

## II.    Preliminary Matters

### A.    Evidence Presented to the Appeals Council

After the ALJ issued his decision, Plaintiff provided evidence to the Appeals Council to consider in deciding his request for review of the ALJ's decision. (R. 2, 6); (Pl. Brief 22 & Attach. 5 (labeled Exhibit A, and hereinafter referred to as Exhibit A)). Plaintiff treats all of the evidence presented to the Council as a unit, and argues that the Appeals Council did not consider or mention certain of that evidence which the Council had made a part of the administrative record, "and did not even place in the record Exhibit A." (Pl. Brief 22). He argues that the Council erred in placing "rote reliance on the date of the records without evaluating their importance to the relevant time period." Id. Notably lacking from Plaintiff's Brief however, is a specific request for a sentence six

4

remand based "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (sentence six).

The Commissioner responds that the evidence the Appeals Council made a part of the administrative record "did not shed new light on [Plaintiff's] condition" (Comm'r Br. 22), or "did not show that the ALJ's finding that Plaintiff was not disabled . . .was contrary to the weight of the evidence." Id. at 23. As to Exhibit A, the Commissioner argues that although Plaintiff asserts that he submitted it to the Appeals Council, "he has provided no evidence of delivery or attempted delivery by mail, e-mail, or hand." Id. at 24. She argues that "evidence apparently was neither before the ALJ when he made his decision, nor before the [Appeals Council] when administrative proceedings officially ended." Id.

Despite the Commissioner's contrary argument, the court finds that both the evidence which was made a part of the administrative record and Exhibit A were presented to the Appeals Council. Moreover, the Council explicitly determined that Exhibit A was not chronologically relevant, did not make it a part of the administrative record, and did not accept it in deciding not to review the ALJ's decision.

The ALJ issued his decision in this case on January 11, 2013 (R. 12, 28), and on March 14, 2013, counsel signed a "Request for Review of Hearing Decision/Order," and forwarded it to the Appeals Council. (R. 10, 11). Thereafter, on July 23, 2014, the Appeals Council issued a "Notice of Appeals Council Action" denying Plaintiff's request

5

for review of the ALJ's decision in which it included an attached "Order of Appeals Council," also dated July 23, 2014.  (R. 1-6).  Plaintiff asserts that Exhibit A was submitted to the Appeals Council on the same day as his representative's Brief which was made Exhibit 23E of the administrative record in the "Order of Appeals Council" dated July 23, 2014.  (Pl. Br. 21).  He asserts that Exhibit A was submitted to the council using the Social Security Administration's submission bar code identifying the electronic file in this case, and he now includes the fax documentation under which the Exhibit A records were submitted to the Council.  Id. (Exhibit A, pp.45, 46 (dated 09/16/2013)).  The Commissioner's argument that Plaintiff provided no evidence of delivery or attempted delivery of Exhibit A is belied by Plaintiff's inclusion of the fax documentation. Moreover, the Appeals Council explicitly considered and rejected that evidence.

The Council discussed all of the evidence presented by Plaintiff, including the records in Exhibit A in the section of its Notice titled "What We Considered:"

> In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council with the entire record.  We considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.  We concluded that the additional evidence does not provide a basis for changing the Administrative Law Judge's decision.
>
> We also looked at medical evidence from Abay Neuroscience Center, dated April 8, 2013 through August 27, 2013.  The Administrative Law Judge decided your case through January 11, 2013.  This new information is about a later time.  Therefore, it does not affect the decision about whether you were disabled beginning on or before January 11, 2013.

6

> If you want us to consider whether you were disabled after January 11,
> 2013, you need to apply again.  The new information you submitted is
> available in your electronic file for you to use in your new claim.

(R. 1-2).

As the first paragraph quoted above makes clear, the Appeals Council considered the "additional evidence" listed on the "Order of Appeals Council" along with "the entire record" in deciding to deny Plaintiff's request for review of the ALJ's decision (R. 1), and it "concluded that the additional evidence does not provide a basis for changing the Administrative Law Judge's decision."  (R. 2) (emphasis added).  The repeated use of the term "additional evidence" in the first paragraph confirms that the "additional evidence" considered was that evidence listed on the "Order of Appeals Council"--Exhibit 23E, Exhibit 22F, Exhibit 23F, and Exhibit 24F.  (R. 6).

In the second paragraph quoted above, the Council noted that it had "also looked at medical evidence from Abay Neuroscience Center, dated April 8, 2013 through August 27, 2013."  (R. 2) (emphasis added).  That is precisely the evidence contained in Exhibit A.  (Pl. Brief, Attach. 5).  In fact, the title page of Exhibit A states "Medical Records from Abay Neuroscience Center Matthew N. Henry, M.D. Dated 04/08/13 To 08/27/13." (Exhibit A, p.1) (emphases added).  Based upon the Appeals Council's identification of this "new information," and the identical inclusive dates of the records identified, there can be no doubt that the Appeals Council considered the medical records Plaintiff submitted to the Council and now includes with his Social Security Brief as Exhibit A. However, the second paragraph quoted above refers to this evidence as "new

7

information" that it "also looked at" (R. 2), as distinguished from the "additional

evidence" it "ma[de] part of the [administrative] record." (R. 6). The Council noted that

the ALJ had decided this case through January 11, 2013, and that the "new information"

from Abay Neuroscience Center "is about a later time." (R. 2). It concluded that the

"new information" "does not affect the decision about whether [Plaintiff was] disabled

beginning on or before January 11, 2013." Id. Consequently, in the third paragraph

quoted above, the Council explained that if Plaintiff wanted the agency to consider

whether he was disabled after January 11, 2013, he must file a new application. Id. The

Appeals Council's Notice makes clear that it received both the "additional evidence" it

made a part of the administrative record and the "new information" from Abay

Neuroscience Center (Exhibit A) which it did not consider in its determination whether to

review the ALJ's decision because it was "about a later time."

The regulations provide that in deciding whether to review an ALJ's decision, the

"Appeals Council shall evaluate the entire record including the new and material evidence

submitted if it relates to the period on or before the date of the administrative law judge

hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b) (emphasis added). If a claimant

submits evidence "which does not relate to the period on or before the date of the

administrative law judge hearing decision, the Appeals Council will return the additional

evidence to [the claimant] with an explanation as to why it did not accept the additional

evidence and will advise [the claimant] of [his] right to file a new application." Id.

§§ 404.976(b), 416.1476(b). That is what happened here. With regard to the evidence it

8

determined was new, material, and chronologically relevant (the "additional evidence"), the Council made that evidence a part of the administrative record at Exhibits 23E, 22F, 23F, and 24F.  (R. 6).  With regard to the medical evidence from Abay Neuroscience Center, dated April 8, 2013 through August 27, 2013 (the "new information"), it explained that the ALJ decided the case through January 11, 2013, that the "new information" is about a later time, it had not accepted the "new information" because it was not chronologically relevant, and it informed Plaintiff of his right to file a new application.  (R. 2).

The Tenth Circuit has interpreted the regulations and decided that when the Appeals Council accepts new, material, and chronologically relevant evidence, that evidence becomes a part of the administrative record which must be considered by a court when reviewing the final decision.  O'Dell v. Shalala, 44 F.3d 855, 858-59 (10th Cir. 1994).  Thereafter, the Tenth Circuit determined that even when the Appeals Council does not specify whether the evidence submitted to it qualifies as new, material, and chronologically relevant evidence, if the Council makes the evidence at issue a part of the administrative record, the court will interpret that action "as an implicit determination" that the evidence is "qualifying new evidence," and will consider it in reviewing the Commissioner's decision.  Martinez v. Barnhart, 444 F.3d 1201, 1207 (10th Cir. 2006). In accordance with O'Dell and Martinez, the court concludes that the Council determined the evidence in Exhibits 23E, 22F, 23F, and 24F is "qualifying new evidence," and the court will consider that evidence in its review of the decision at issue here.

9

As to the evidence in Exhibit A, the Council determined that evidence is not chronologically relevant, and is not qualifying new evidence, and it did not consider that evidence in its determination not to review the ALJ's decision.  Nevertheless, "[w]hether evidence qualifies as new, material and chronologically relevant is a question of law subject to [the court's] de novo review."  Chambers v. Barnhart, 389 F.3d 1139, 1142 (10th Cir. 2004) (brackets omitted).  And, "if the evidence qualifies but the Appeals Council did not consider it, the case should be remanded for further proceedings."  Id.

Plaintiff here argues that the Appeals Council erred in finding that the evidence in Exhibit A was about a later time because the evidence arguably "rebuts some of the ALJ's key findings" (Pl. Br. 25) (quoting Honeycutt v. Colvin, No. 13-cv-1243-DDC, 2014 WL 4909072 (D. Kan. Sept. 30, 2014)), and was therefore, erroneously excluded from consideration.  The only "key finding" to which Plaintiff directs the court's attention is the ALJ's finding that there was no "nerve root compression (though the evidence on this is somewhat equivocal)."  (Pl. Br. 25) (quoting R. 18).  This is so in Plaintiff's view, because the evidence of spine impairments began before the ALJ's decision, and the workup on them occurred shortly after the decision.  (Pl. Br. 24) (citing R. 646) (Dr. Henry's letter dated March 8, 2013).  Plaintiff argues that "[t]here were new and better radiological studies preparatory to surgery that documented not just the current problems but the problems about which Plaintiff had been complaining and had been treated during the relevant time period.  The surgical findings provide even more such documentation." (Pl. Br. 25) (without citation).

10

The court cannot agree.  Plaintiff's attempt to produce unequivocal evidence of nerve root compression does not succeed by using evidence from either Exhibit A or the administrative record.  Contrary to Plaintiff's argument, Dr. Henry's letter to which Plaintiff cites is dated March 8, 2013, two months <u>after</u> the ALJ's decision.  (R. 646).  Moreover, the Appeals Council determined the evidence including that letter was qualifying new evidence, and made it a part of the administrative record.  (R. 6) (making Exhibit 23F (R. 644-57) part of the record).  To be sure, Dr. Henry's letter refers to "severe neural foraminal narrowing on left" at C4 to C7 and "neural foraminal narrowing on the left at L5-S1," but nowhere does it talk about "nerve root compression."  (R. 646).  Dr. Henry also stated that "[a]t this point in time, we recommend some physical therapy and muscle relaxants," and noted that at some unspecified time Plaintiff "will call us if he wishes to schedule surgical intervention."  <u>Id.</u>

Dr. Henry's treatment note dated March 8, 2013--the same date as his letter, and upon which the letter was premised--states that a "CT myelogram of his lumbar spine reveals a disc bulge on the left at L4-L5 with no foraminal narrowing on the left at L5-S1.  CT myelogram of the cervical spine reveals kyphotic deformity centered at C4-C5, C5-C6, and C6-C7 with severe neural foraminal narrowing on left at these levels."  (R. 648).  The treatment note also states that Dr. Henry recommended physical therapy and muscle relaxants, and "[i]f this does not work, I have offered" Plaintiff surgery.  <u>Id.</u>  The record does not contain a report of a CT scan of the lumbar spine near this period, but Dr. Henry's notes contain a report of a CT scan of the cervical spine dated January 21, 2013,

with findings including in relevant part "no cord compression," "narrowing of the left C4-5 neural foramen," "mild narrowing of the left C5-6 in the left C6-7 neural foramina," and "no evidence of significant central spinal stenosis." (R. 649). This equivocal evidence, all included in the administrative record, is consistent with, and does not even arguably rebut the ALJ's finding that there is no "nerve root compression (though the evidence on this is somewhat equivocal)." (R. 18).

The evidence in Exhibit A is no more helpful to Plaintiff's argument. That exhibit contains three separate "History and Physical" forms dated April 9, 2013, May 14, 2013, and June 12, 2013, prepared in anticipation of surgery, and each with a different proposed "Admit Date." (Ex. A, pp. 27-29, 33-38) (revealing "Admit Date[s]" of April 15, 2015, May 20, 2013, and June 20, 2013). Each "History and Physical" refers to CT myelograms showing "severe neural foraminal narrowing on the left" at C4 to C7, and "neural foraminal narrowing on the left at L5-S1." (Ex. A, pp. 28, 34, 37). However, none of these forms cites the specific CT report on which it relies, and each one appears to be a reiteration of the information contained in Dr. Henry's treatment note dated March 8, 2013. Id. As noted above, that treatment note and the CT report upon which it relies, are consistent with, and do not rebut, the ALJ's finding of which Plaintiff complains. Therefore, Plaintiff has not shown that the evidence in Exhibit A relates to the period on or before the date of the administrative law judge hearing decision. The court finds, as did the Appeals Council, that the evidence in Exhibit A is not qualifying evidence because it is not chronologically relevant to the time period before the ALJ decision.

12

The medical records in Exhibit A relate exclusively to Plaintiff's spinal surgery apparently tentatively scheduled for both April 15, and May 20, 2013, but ultimately performed on June 20, 2013, including pre-clearance, surgery, and follow-up; and to medical treatment records dated between April 8, 2013 and August 27, 2013. That evidence covers treatment beginning about three months after the ALJ's decision, and does not rebut evidence in the administrative record. Moreover, as the court found herein, it does not rebut the ALJ's "key finding" of which Plaintiff complains, made three months earlier. The court finds Exhibit A is not qualifying evidence and properly was not made a part of the administrative record in this case. If Plaintiff believes the surgery to which Exhibit A refers resulted in an unfavorable outcome preventing him from performing substantial gainful activity, he should file a new application for benefits, as the Appeals Council suggested.

Because Exhibit A is not qualifying evidence, the court will not remand for further consideration of that evidence pursuant to sentence six of 42 U.S.C. § 405(g), nor will it consider Exhibit A in its review of the Commissioner's decision, because the court's review is to be made based "upon the pleadings and the transcript of the record," 42 U.S.C. § 405(g) (sentence four), and the court may not consider evidence outside that record in its review. E.g., Selman v. Califano, 619 F.2d 881, 884-85 (10th Cir. 1980) ("We cannot consider new evidence proffered at this level, except to determine whether the case should be remanded under 42 U.S.C. § 405(g) [sentence six].").

**B.** **Technical Errors**

As another preliminary matter, the court notes that much of Plaintiff's Brief is a "stream of consciousness" argument alleging technical errors of omission by the ALJ, or failures to note a particular statement or nuance contained in a medical record, without explanation of how or why these particular alleged errors necessitate remand, or how they prejudiced Plaintiff. "[C]ommon sense, not technical perfection" is the court's guide in judicial review of a decision by the Commissioner. Keyes-Zachary v. Astrue, 695 F.3d 1156, 1167 (10th Cir. 2012). The court will not search through the record in response to a party's arguments in an attempt to identify prejudicial error, particularly where the party is represented by counsel, but has not explained the basis for his allegations of reversible error.

### III.   Listing 1.04(A)

Plaintiff claims error in the ALJ's step three analysis because "[t]here was not even conclusory reference to whether Plaintiff equaled" Listing 1.04(A), and because "[t]he ALJ did not discuss specific medical evidence record [sic] about this listing in his Step 3 analysis as [certain legal] authorities require." (Pl. Br. 6) (citing Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996), which is quoted extensively in Plaintiff's Brief at pp. 4-6). The Commissioner argues that it is Plaintiff's burden at step three to show that his impairment(s) meets or medically equals the criteria of a Listing, and that Plaintiff has not done so in this case. (Comm'r Br. 11). She argues that Plaintiff's reliance on Clifton is misplaced because the ALJ in this case sufficiently explained his rationale, which is supported by the record evidence. The court agrees with the Commissioner.

14

As the parties' briefs suggest, the Commissioner has provided a "Listing of Impairments" which describes certain impairments that she considers disabling.  20 C.F.R. §§ 404.1525(a), 416.925(a); <u>see also</u>, Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If plaintiff's condition meets or equals the severity of a listed impairment, that impairment is conclusively presumed disabling.  <u>Williams</u>, 844 F.2d at 751; <u>see</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141 (1987) (if claimant's impairment "meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled").  However, plaintiff "has the burden at step three of demonstrating, through medical evidence, that his impairments 'meet <u>all</u> of the specified medical criteria' contained in a particular listing."  <u>Riddle v. Halter</u>, No. 00-7043, 2001 WL 282344 at *1 (10th Cir. Mar. 22, 2001) (quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (emphasis in <u>Zebley</u>)).  "An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify" to meet or equal the listing.  <u>Zebley</u>, 493 U.S. at 530.

"The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing <u>any</u> gainful activity, not just 'substantial gainful activity.'"  <u>Zebley</u>, 493 U.S. at 532-33 (emphasis in original) (citing 20 C.F.R. § 416.925(a) (1989)).  The listings "streamlin[e] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background."  <u>Yuckert</u>, 482 U.S. at 153.  "Because the

15

Listings, if met, operate to cut off further detailed inquiry, they should not be read expansively." Caviness v. Apfel, 4 F. Supp. 2d 813, 818 (S.D. Ind. 1998).

The ALJ specifically found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (R. 18) (finding no. 4) (bolding omitted). Thereafter, he explained that Listing 1.04 is not met or medically equaled because Plaintiff does not have "nerve root compression (though the evidence of this is somewhat equivocal), spinal arachnoiditis or lumbar spinal stenosis." Id. Plaintiff's assertion that there was not even a conclusory reference to whether Plaintiff equaled Listing 1.04 is belied by the findings quoted above.

Plaintiff's argument that the ALJ only discussed the medical evidence in his step four analysis, and thereby erred by failing to discuss "specific medical evidence" regarding Listing 1.04 in his step three analysis as required by Clifton is without merit. First, the ALJ in Clifton erred, as Plaintiff's quotation reveals, because he "did not discuss the evidence or his reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing." (Pl. Br. 5) (quoting Clifton, 79 F.3d at 1009). Here, the ALJ specifically identified eight Listings he considered--1.02, 1.04, 3.02, 3.03, 4.05, 12.04, 12.06, and 12.09. (R. 18). As quoted above, the ALJ stated his rationale for determining that Plaintiff did not meet or equal listing 1.04--Plaintiff does not have "nerve root compression (though the evidence of this is somewhat equivocal), spinal arachnoiditis or lumbar spinal stenosis." Id. Moreover, the ALJ stated his finding

16

that the record evidence does not show nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis, and Plaintiff does not explain how it would be possible to discuss the evidence which does not show those criteria.  An ALJ is not required to discuss every piece of evidence in an effort to demonstrate that the evidence does not show a particular fact.  It is Plaintiff's burden to point to evidence which demonstrates the error in the ALJ's finding, and as discussed above he does not point to unequivocal evidence of nerve root compression.  And, Plaintiff's suggestion that Clifton requires certain evidence to be discussed in the step three portion of the decision rather than the step four portion of the decision exalts form over substance, and is not supported by any hint in the Clifton decision.  The holding in Clifton to which Plaintiff appeals simply does not apply here.

## IV.    Errors Alleged in the ALJ's RFC Assessment

As noted above, Plaintiff's allegations of error in the ALJ's RFC assessment consist of a "stream of consciousness" argument alleging primarily technical errors in the ALJ's assessment, or suggesting how the evidence could be viewed in favor of disability, without specifying the harm or the prejudice accruing against Plaintiff as a result of the alleged errors.  The essence of this argument is to suggest that the court should reweigh the evidence in favor of Plaintiff, substitute its judgment for that of the Commissioner, and find disability.  The court may not do so.  Bowman, 511 F.3d at 1272; accord, Hackett, 395 F.3d at 1172.  The mere fact that there is evidence which might support a contrary finding will not establish error in the ALJ's assessment.  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an

17

administrative agency's findings from being supported by substantial evidence. [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966) (same).

Nonetheless, the court addresses those specific allegations of prejudicial error presented by Plaintiff.

## A.    Mental RFC Assessment

Plaintiff claims the limitation to "simple, unskilled work involving routine, repetitive tasks" (R. 20) is "a job description, not a mental limitation," and that in making his mental RFC assessment the ALJ did not itemize the various mental abilities included in the four broad mental functional categories of activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  (Pl. Br. 7).  The court does not agree.

The starting point for judicial review of the Commissioner's decision is the Commissioner's final decision--here, that is the ALJ's decision.  The ALJ determined that with regard to his mental impairments, Plaintiff is able to "perform simple, unskilled work involving routine, repetitive tasks."  (R. 20).  In discussing his RFC assessment, the ALJ recognized that although Plaintiff did not include mental impairments in his application, the evidence reflects "some history of depression and anxiety."  (R. 23).  He summarized a psychological evaluation performed by Dr. Klemens on April 11, 2011 at

the request of the Disability Determination Service, noting Plaintiff's report to Dr.

Klemens of a depressing situation, psychiatric medication years ago, but not recently; a

recent pacemaker implant and paranoia that people would get near and disrupt or damage

it; depression because of what he could not do, and because several family members

passed away recently; and a history of alcohol abuse, marijuana abuse, and legal

problems.  (R. 23).  He noted Dr. Klemens's report of an unremarkable mental evaluation,

no difficulty in understanding instructions or recalling information, average attention and

concentration, social functioning apparently unlimited, no deficits in ability to interact,

and the ability to manage money.  Id.  The ALJ noted Dr. Klemens's opinion that Plaintiff

might benefit from short-term therapy, but that "his psychiatric symptoms did not

significantly impact his ability to work."  Id. at 23-24.  He summarized Dr. Klemens's

diagnoses, and noted that he had assigned a global assessment of functioning (GAF)[2]

score of 72, indicating less than mild symptoms.  Id. at 24.

---

[2]A Global Assessment of Functioning, or GAF, score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 32 (4th ed. text revision 2000).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  Id. at 34.  GAF is a classification system providing objective evidence of a degree of mental impairment.  Birnell v. Apfel, 45 F. Supp. 2d 826, 835-36 (D. Kan. 1999) (citing Schmidt v. Callahan, 995 F. Supp. 869, 886, n.13 (N.D. Ill. 1998)).

A GAF score in the range from 71 to 80 indicates "**If symptoms are present, they are transient and expectable reactions to psycho-social stressors** (e.g., difficulty concentrating after family argument), **no more than slight impairment in social, occupational, or school functioning** (e.g., temporarily falling behind in schoolwork)." DSM-IV-TR, at 34 (emphasis in original).

The ALJ recognized that Plaintiff was prescribed antidepressants on August 18, 2011 at the O'Shea Memorial Clinic in Jetmore, Kansas.  (R. 24) (citing Ex. 10F (R. 428)).  He summarized Plaintiff's treatment at The Center for Counseling and Consultation from August 25, 2011 through October 31, 2012.  Id.  He noted that Plaintiff was assessed with a GAF score of 51 on admission, and began taking medication, and that his condition improved, represented by a GAF score of 55 beginning in December 2011, and 57 from March through October 2012.  Id.  He found that the records indicated Plaintiff was doing pretty well mentally despite the challenge of raising four teenaged boys.  Id.  He noted that although Plaintiff was jailed for allegedly sexually assaulting a 15-year-old cousin, and reported being threatened by family, "he continued to function fairly well with a GAF score of 57 on September 17, 2012."  Id. (citing Ex. 17F/18 (R. 507)).  The ALJ noted that Plaintiff was assigned GAF scores from 51 to 72, and recognized that the Diagnostic and Statistical Manual of Mental Disorders indicates that GAF scores from 51 to 60 represent moderate symptoms while scores from 61 to 70 represent mild symptoms.  Id.

The ALJ specifically relied on the finding that "no doctor who has treated or examined the claimant has stated or implied that he is disabled or seriously incapacitated."  Id. at 25.  The ALJ explained his evaluation of the opinions regarding Plaintiff's mental impairments:

> Consultative examiner, Dr. Klemens found no psychiatric impairments that would significantly impact the ability to work (Exhibit 8F).  After this date, the claimant sought treatment at the Center for Counseling and Consultation

with evidence of mild to moderate impairments (Exhibit 17F).  Substantial weight is given to the State agency medical consultants who found the claimant limited to a range of simple, routine, light work as outlined in the above residual assessment (Exhibit 7A, 8A, 9F, 11F-12F).  This is consistent with the evidence as a whole.

(R. 26).

Plaintiff's argument that the ALJ "made no findings about [Plaintiff's] specific mental impairment limitations" and did not itemize the detailed functional limitations resulting from the moderate limitations in social functioning and in concentration, persistence, and pace which he found at step three is belied by the assessment summarized above.  As the ALJ noted, no treating source physician or psychologist, or non-treating source physician or psychologist (who examined Plaintiff) stated or implied that Plaintiff's mental impairments disabled or seriously incapacitated him.  Moreover, as the ALJ also explained, Dr. Klemens opined that Plaintiff's "psychiatric symptoms alone do not significantly impact his ability to work at this time" (R. 425), and the evidence from the treatment records of The Center for Counseling and Consultation indicate only mild to moderate impairment in functioning.  Finally, the state agency consultants to whom the ALJ accorded substantial weight, opined that Plaintiff can understand, remember, and carry out simple instructions; and can sustain simple, routine tasks, and complete a normal work week.  (R. 114, 115, 129, 130).

Plaintiff argues that it was error for the ALJ to rely upon the lack of a medical opinion of disability or incapacity.  (Pl. Br. 17-18).  However, the very decisions relied upon by Plaintiff demonstrate the error in his argument.  The court in Ford v. Apfel, No.

99-5134, 2000 WL 702752, *4 (10th Cir. May 26, 2000), explained that use of such an opinion was error in that case because the claimant was not working during the relevant time period.  Likewise, as Plaintiff acknowledges, Judge Brown in Hardin v. Apfel, 96-1382-WEB, slip op. at 12-13 (D. Kan. Sept. 4, 1998), recognized that such reliance was error because the claimant was not employed when the treatment was received.  Here, however, Plaintiff was working during the relevant times.  Moreover, as the ALJ noted, in one instance, Dr. Sharma actually provided a work release for Plaintiff.  (R. 25).

To the extent that Plaintiff's argument--that the limitation to "simple, unskilled work involving routine, repetitive tasks" (R. 20), is "a job description, not a mental limitation" (Pl. Br. 7)--alleges an error, the court finds none.  As noted above, those limitations are supported by the record evidence.  If they constitute a job description, they describe the mental requirements of the jobs of which the ALJ determined in his RFC assessment that Plaintiff is capable.

Plaintiff also argues that the "additional evidence" provided to the Appeals Council included a statement from Mr. Markings, a Licensed Masters Level Psychologist (L.M.L.P.) who treated Plaintiff at The Center for Counseling and Consultation, and which the Appeals Council did not mention.  (Pl. Br. 22).  He argues that Mr. Markings's statement is supported by the treatment records, id. ("supports by [sic] the treatment records"), explains Plaintiff's condition and limitations, and clarifies Mr. Markings's use of GAF scores, upon which the ALJ mistakenly relied.  Id. (citing R. 660-665).  In its discussion above regarding the "additional evidence" presented to the Appeals Council,

22

the court quoted the Council's finding "that the additional evidence does not provide a basis for changing the Administrative Law Judge's decision."  (R. 2).  The question before the court then, is whether that finding is supported by substantial record evidence, and the court believes it is.

As Plaintiff suggests, Mr. Markings purports to explain Plaintiff's condition and Mr. Markings's earlier treatment notes; and in a "Mental Residual Functional Capacity" questionnaire he opines that Plaintiff is "Markedly Limited" in twenty out of twenty mental functional abilities.  (R. 660-63).  The questionnaire completed by Mr. Markings does not define the term "Markedly Limited," but that term as used in the questionnaire indicates the worst possible limitation in mental functioning of those listed on the form. In rating Plaintiff's "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness," Mr. Markings responded that Plaintiff is both "Not Significantly Limited" and "Markedly Limited" (R. 663), and explained that he had done so "because [Plaintiff] does maintain his personal appearance."  (R. 661).  The only conclusion to be drawn from Mr. Markings's questionnaire is that while Plaintiff is able to maintain his personal appearance, he is unable to function in a minimally acceptable manner in any other mental functional ability.  Contrary to Plaintiff's suggestion, neither Mr. Markings's explanation of Plaintiff's condition nor his mental RFC form is supported by his treatment notes or by the other record evidence.

The first treatment note signed by Mr. Markings is dated December 22, 2011 (R. 567-68), and by that time Plaintiff's GAF score, which had been rated at 51 on intake (R.

23

596), had already been raised to 55 on December 5, 2011.  (R. 571).  The "Diagnosis -

Multiaxial Assessment," is the form used by The Center for Counseling and Consultation

to record a client's diagnoses and GAF scores.  (R. 490-596) (passim).  The first such

form signed by Mr. Markings is dated March 1, 2012, and is the first note which records

an increase in assigned GAF score to 57.  (R. 553).  Treatment notes thereafter do not

record any change in GAF score below 57.  (R. 490-550) (passim).

    The ALJ explained his evaluation of The Center for Counseling and Consultation

treatment notes:

> These records indicate continued improvement with the GAF listed at 55 in
> December 2011 and a GAF of 57 beginning in March 2012 to the present
> (Exhibit 17F/65, 42, 18).  These records indicate that he did fairly well
> despite challenges such as raising four teenage boys (Exhibit 17F/74) and
> following his arrest and incarceration in August 2012 for sexually
> assaulting/touching a 15 year old cousin (Exhibit 17F/25).  Although he
> reported that he was threatened by family and spent time isolating due to
> the ridicule related to this legal charge, he continued to function fairly well
> with a GAF score of 57 on September 17, 2012 (Exhibit 17F/18).

(R. 24).  The record evidence supports the ALJ's explanation.  Mr. Markings's treatment

notes primarily reflect Plaintiff's reports to Mr. Markings, and Mr. Markings's advice on

coping skills and how to handle the problems presented.  They report Plaintiff's progress

variously as "Poor," "Fair," or "Good," but they do not suggest the marked limitations

opined by Mr. Markings in his later statement.

    In his statement, Mr. Markings explained that the GAF scale is very subjective,

and that he personally dislikes it, but that "[w]e tend to rate patients' GAF in the context

of their support system and therapy and use it more to gague improvement rather than

scoring with reference to ability to work[,] especially when the patient is not working. Mr. Patterson is struggling to work very few hours per week.  If I were to score strictly by the DSM rules, Mr. Patterson's GAF would be consistently under 50 to match the DSM definition." (R. 664).  Such a statement, prepared after-the-fact at the behest of counsel does not provide a basis to change the ALJ's decision.  The statement reflects the opinion that Plaintiff cannot acceptably function in any mental ability except to maintain his personal appearance, and is at best inconsistent with the tenor of the contemporaneous treatment notes.  And, it is significantly different than the report of Dr. Klemens who also examined Plaintiff and recommended therapy, but found that Plaintiff's psychiatric symptoms do not significantly impact his ability to work.  Mr. Markings's statement acknowledges that GAF scores are subjective and are guided by the Diagnostic and Statistical Manual's definitions and rules, but then attempts to assert that the GAF scores at The Center for Counseling and Consultation do not conform to those definitions or rules even approximately.  Moreover, most of the GAF scores in the treatment notes, including the intake score, were assigned by providers other than Mr. Markings, and Mr. Markings was the first provider to raise the GAF score to the highest score received at The Center for Counseling and Consultation.  The assigned GAF score remained at that level throughout Plaintiff's treatment at the Center for the next six months, despite Plaintiff's incarceration and accusation of sexual assault.  While Mr. Markings's statement might conceivably support a finding that Plaintiff is disabled, in light of all the record evidence, it by no means compels that finding.  Substantial record evidence

25

supports the decision below.  It was not error for the Appeals Council to find that the

"additional evidence" including Mr. Markings's statement does not provide a basis for the

Council to change the ALJ's decision.

### B.    The ALJ's Credibility Determination

Although Plaintiff did not provide an organized and cohesive argument regarding

the ALJ's evaluation of the credibility of Plaintiff's allegations of disabling symptoms, at

various points in his rambling argument regarding RFC he suggested that the ALJ erred in

his credibility determination.  He argued that the ALJ mischaracterized evidence relating

to credibility (Pl. Br. 8, 15-16), that certain evidence supports Plaintiff's credibility, id. at

10, 16, 19, that the ALJ did not consider the difficulties and limitations Plaintiff

reportedly experienced in performing his daily activities, id. at 12-15, that the ALJ

ignored factors supporting credibility, id. at 18, and that these errors in the credibility

determination require remand because all of the credibility factors must be considered in

combination by the ALJ.  Id. at 19-20.  The Commissioner argues that the ALJ provided

legally sufficient reasons for discounting the credibility of Plaintiff's allegations of

disabling symptoms.  (Comm'r Br. 20).   She points to evidence which in her view

supports the ALJ's credibility determination.  Id. at 21-22.

Much of Plaintiff's credibility argument is simply a statement that the ALJ

weighed the evidence wrongly, and an implied request that the court reweigh the evidence

and substitute its judgment for that of the ALJ.  As already noted above, the court may

not.  Bowman, 511 F.3d at 1272 (The court may "neither reweigh the evidence nor

26

substitute [its] judgment for that of the agency."); accord, Hackett, 395 F.3d at 1172.  The mere fact that there is evidence which might support a contrary credibility finding will not establish error in the ALJ's determination.   Lax, 489 F.3d at 1084; see also, Consolo, 383 U.S. at 620.

The court's review of an ALJ's credibility determination is deferential.  It is generally treated as binding on review.  Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983).  "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence.  Wilson, 602 F.3d at 1144; accord Hackett, 395 F.3d at 1173.   Therefore, in reviewing the ALJ's credibility determinations, the court will usually defer to the ALJ on matters involving witness credibility.  Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994); but see Thompson, 987 F.2d at 1490 ("deference is not an absolute rule").  "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" Wilson, 602 F.3d at 1144 (quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)); Hackett, 395 F.3d at 1173 (same).

The framework for a proper credibility analysis is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987).  An ALJ must consider (1) whether the claimant has established a symptom-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both

27

objective and subjective, the claimant's symptoms are in fact disabling.  See, Thompson, 987 F.2d at 1488 (explaining the Luna framework).  The Commissioner has promulgated regulations suggesting relevant factors to be considered in evaluating credibility:  Daily activities; location, duration, frequency, and intensity of symptoms; factors precipitating and aggravating symptoms; type, dosage, effectiveness, and side effects of medications taken to relieve symptoms; treatment for symptoms; measures plaintiff has taken to relieve symptoms; and other factors concerning limitations or restrictions resulting from symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).  The court has also recognized a non-exhaustive list of factors which overlap and expand upon the factors promulgated by the Commissioner.  Luna, 834 F.2d at 165-66.  Those factors include:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Thompson, 987 F.2d at 1489).  The Kepler opinion does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of Kepler are satisfied.  Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).

Here, the ALJ explained his credibility determination as a part of his RFC assessment.  (R. 19-25).  He first explained the regulations and Social Security Rulings

controlling his credibility determination, and explained the two-step process contained therein. (R. 20). Application of that process is consistent with the <u>Luna</u> framework, and Plaintiff does not argue otherwise. The ALJ then summarized Plaintiff's testimony and other reports, and the record medical evidence. (R. 20-24). He recognized that the impairments alleged by Plaintiff could produce symptoms such as those alleged, but found that Plaintiff's allegations regarding the intensity, persistence, and limiting effect of those symptoms "are not entirely credible." (R. 21). The ALJ recognized the regulatory factors for evaluating evidence regarding credibility, and explained why he had found Plaintiff's allegations are not credible. (R. 24-25).

He explained that he had based his credibility finding upon the facts that Plaintiff's "daily activities are not significantly limited," that he provided discrepant statements at the hearing regarding his limitations, that he had not yet participated in physical therapy or had surgery for his back or shoulder, that his medication is generally effective without side effects, that he worked as a cook at a Sonic Drive-in, and that although he reported to Dr. Witmer and on his function report that he worked up to 24 hours a week, at the hearing he testified that he worked only ten hours a week. (R. 25). The reasons given to discount Plaintiff's credibility are supported by the record evidence despite Plaintiff's suggestion that the court should weigh the evidence differently than did the ALJ.

Plaintiff argues that the ALJ should not rely upon the fact that Plaintiff had not participated in physical therapy because it was offered by Plaintiff's physician merely as one of two options, and Plaintiff chose the other option--epidural injections. (Pl. Br. 10).

While in a hypertechnical sense Plaintiff's argument is correct, the record supports the ALJ's determination. On November 28, 2012, Dr. Steffen noted that he had discussed options with Plaintiff, and he stated, "I really pushed physical therapy but he felt the severity of his pain warranted his moving towards epidural steroid injections and ultimately I acquiesced to his wishes." (R. 598). Moreover, on March 8, 2013, Dr. Henry was still recommending "some physical therapy." (R. 646, 648). The ALJ is correct that Plaintiff had not participated in physical therapy, and the record reveals that this was against the recommendation of his physician. That the physician ultimately acquiesced does not change the import of the recommendation. Neither the regulations nor reason requires that a physician must refuse to treat a claimant before the ALJ may rely upon that physician's contrary recommendation.

Plaintiff next argues that the ALJ erred in relying on Plaintiff's daily activities to discount his credibility, because the ALJ did not consider the difficulties and limitations Plaintiff reported in doing those activities, conducted a selective and misleading evidentiary review to discredit Plaintiff, and impermissibly relied on "minimal daily activities" to discredit Plaintiff. (Pl. Br. 12-13). Once again, the court does not agree. Many of the cases upon which Plaintiff relies are unpublished opinions of other courts in this district, and the court does not find their facts sufficiently similar to this case nor their rationale compelling in these circumstances. And, in Krauser v. Astrue, 638 F.3d 1324, 1330-32 (10th Cir. 2011), the one controlling precedent to which Plaintiff cites, the court found error in the ALJ's evaluation of the treating physician's opinion and remanded for

30

reconsideration of that opinion.  Thereafter, the court considered it appropriate to clarify a few points regarding the credibility determination "in case [the plaintiff's] credibility continues to be material" on remand.  Id. 638 F.3d at 1332.  Therefore, the Krauser court's discussion regarding credibility is dicta which is not binding on this court.

Even assuming the Krauser credibility discussion is binding, it is not applicable to the case presented here.  In Krauser, the court quoted the ALJ's decision in which the ALJ had explained that, "[i]n a typical day, the claimant stated that he exercised, watched television, did yard work, helped with housework, and did his own laundry," and that "the claimant testified that he was able to exercise, work in the yard, do laundry, perform housekeeping chores, and drive."  Id. (citing the record, App. Vol. 2 at 20).  The court recognized that on its face these activities are inconsistent with the "degree of impairment voiced by Mr. Krauser," but went on to explain that although the ALJ purported to rely upon the testimony of Mr. Krauser, Mr. Krauser did not testify as to those activities.  Id. The court explained that contrary to the ALJ's explanation, the plaintiff actually testified that every week or two he spends ten to fifteen minutes working in the yard; that for housework he did not sweep, did not cook, only put dishes in the dishwasher, could make a bed "halfway," and was unable to pick things up off the floor; and that he could only exercise for four or five minutes at a time.  Id., 638 F.3d at 1333.  The court noted that "Mr. Krauser's activities are more consistent with his claims of significant physical limitations than with the ALJ's conclusion that he is capable of full-time work at the medium exertional level.  On remand, the ALJ should keep in mind that 'sporadic

31

performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity.'" Id. (quoting Thompson, 987 F.2d at 1490).

The unpublished and nonprecedential case of Sitsler v. Astrue, 410 F. App'x 112, 117-18 (10th Cir. 2011), is to a similar effect.  That court found the record revealed that the plaintiff consistently reported limitations in his daily activities, but that "the ALJ's findings regarding Mr. Sitsler's activities included none of these limitations."  Id. at 117. The court noted the Tenth Circuit has "criticized this form of selective and misleading evidentiary review," id., and remanded the case both because of the ALJ's reliance on mischaracterized evidence and because he failed "to consider the uncontroverted evidence of claimant's prescription pain medications."  Id. 410 F. App'x at 118.

To be sure, the ALJ in this case did not state every limitation on every daily activity Plaintiff reported.  However, that is not required.  Such a requirement would force ALJs to produce decisions rivaling the remainder of the administrative record in length, and would make an already time-consuming process virtually interminable.  The question is whether the ALJ provided a fair summary of the evidence which recognized and considered the limitations stated by the claimant and others, or whether he unfairly mischaracterized the evidence after a selective and misleading evidentiary review.  Here, the ALJ provided a fair summary of the evidence revealing that he recognized and considered the limitations alleged.  As a representative, but not exhaustive, example of that fact, the court notes that the ALJ recognized Plaintiff's report that his daily activities "depend[ed] on how he felt" (R. 20), he "tries" to help with household chores (doing

32

dishes, cooking, and light cleaning) and is no longer able to mow the grass (R. 21), and that he testified of a need to lie down for 30 minutes after 15 minutes of standing followed by 15 minutes of sitting.   (R. 25).   The purpose of a credibility determination is to decide whether Plaintiff's allegations of disabling symptoms should be credited, and that very purpose would be defeated if the ALJ were required to accept each limitation a claimant asserted.

The activities relied upon by the ALJ were not merely "minimal daily activities" as contemplated by the court in Thompson or Sitsler.  For, at the hearing Plaintiff testified that he works about ten hours a week (R. 40), and as the ALJ noted, Plaintiff reported in his function report that he was lucky to work 24 hours a week (R. 251, 256), and to Dr. Whitmer that he worked up to 24 hours a week.  (R. 417).

Plaintiff argues that the ALJ's finding--that Plaintiff "provided discrepant answers" at the hearing regarding his limitations in sitting and standing and of his need to lie down--is an erroneous understanding of Plaintiff's complete testimony and should not have been relied upon by the ALJ.  (Pl. Br. 15-16).  The court recognizes that at the hearing, counsel attempted to rehabilitate Plaintiff's testimony, but that does not preclude the ALJ from relying on discrepancies in the testimony which became apparent during the attempted rehabilitation.

At the hearing, Plaintiff testified that in working at Sonic he was standing for about an hour-and-a-half, and the ALJ asked what was the longest period he was able to stand before he had to sit down.  (R. 43).  Plaintiff responded that he could stand

33

approximately two hours before he had to sit, and the ALJ asked how long Plaintiff was able to sit before he had to get up.  Id.  Again, Plaintiff responded that he could sit approximately two hours before he had to stand.  Id.  Thereafter, during counsel's hearing examination of Plaintiff, the following dialogue occurred:

Q     . . . Now, at Sonic you were working one-and-a-half hours, the middle of the day.  What do you do at the end of your work period at, I guess 1:00 is when you're off?

A     Yes, sir.

Q     What do you do?

A     I usually go home and lay [sic] down and rest.

Q     How long do you do that?

A     For approximately around two hours usually.

Q     Do you sleep?

A     I sleep some, and some I just lay [sic], reclined in the recliner.

Q     Do you need that much time to recover from working?

A     Yes, sir.

Q     Okay.  So when you told the Judge you could stand for two hours, which is even more than that, as your maximum -- well, I'm going to ask the question a different way.  It sounds like you need to recover quite a bit if you've been standing that long, is that right?

A     Yes, sir.

Q     So let me ask you, lf you were to stand for 15 minutes to pace yourself differently.  So instead of an hour-and-a-half or two hours, if you were to stand 15 minutes and then sit in an upright position for

34

> 15 minutes, what would you need to do next?  Could you go back to standing again, or would you need to do something else?

A       Yes, I would probably need to do something else.

Q       What would you need to do?

A       Rest for 30 to 45 minutes.

Q       And how would you need to rest? What sort of position?

A       Either reclined or laying [sic] down.

(R. 54-55).

A Social Security hearing is an informal inquiry, and the rules of evidence do not strictly apply.  Therefore, leading questioning of the claimant or other witnesses is not improper.  However, in the line of questioning by the ALJ, Plaintiff testified that he could stand approximately two hours at a time and then testified that he could sit approximately two hours at a time.  Thereafter, when counsel's line of questioning suggested that Plaintiff's response to the ALJ was not desired, and that Plaintiff needs "to recover quite a bit," Plaintiff testified despite his prior testimony, that after standing fifteen minutes followed by fifteen minutes of sitting (time limits supplied by counsel), he would need to rest for thirty to forty-five minutes.  There is clearly a discrepancy between the two lines of testimony and it is not error for the ALJ to rely on that discrepancy in his credibility determination.

In short, the ALJ here applied the correct legal standard in his credibility determination, explained his reasons for discounting Plaintiff credibility, and those

35

reasons are affirmatively linked to and supported by the record evidence.  Although there is evidence from which the ALJ might have reached a different credibility determination, giving the ALJ's determination the deference it is due, the court finds no error.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 9th  day of December 2015, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**